IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| UNITED STATES OF AMERICA | : | Criminal No. 13-199 |
|---|---|---|
| vs. | : | |
| EFRE CARDONA | : | |

MEMORANDUM ORDER

AND NOW, this 5th day of November 2013, upon consideration of Defendant's Motion to Suppress Evidence (Doc. No. 14), Government's response thereto (Doc. No. 17), and the suppression hearing held on Tuesday, August 13, 2013, it is hereby ORDERED that Defendant's Motion to Suppress is GRANTED.

I.  FINDINGS OF FACT

In September 2012, Philadelphia Police Officer James Cullen met with a Confidential Informant ("CI") and received information about Defendant Efre Cardona[1] (Transcript of August 13, 2013 suppression hearing (hereinafter, "Tr.") 32:12-13; 19-20). The CI told Officer Cullen that he or she had known Cardona for approximately three years and that Cardona sold large amounts of heroin and cocaine, and that he possessed firearms. (Tr. 34:7-9; 17-19; 36:23-37:7). The CI identified Cardona's vehicles (Mercedes Benz and a black Camaro) and the address of his

---

[1]Officer Cullen acknowledges that he had never used this CI before, and does not know whether any other officer has utilized the CI in other investigations. (Tr. 54:22-23; 78:1-13). Officer Cullen also acknowledges that the CI never personally engaged in a drug or firearms transaction with Cardona, and is not otherwise involved in the drug trade or in the business of dealing firearms. (Tr. 54:24-55:14).

1

then-residence, both of which Officer Cullen confirmed thereafter. (Tr. 35:24-25). Despite owning several vehicles, the CI said that Cardona routinely drove rental cars to conduct drug transactions. (Tr. 36:5-7). According to the CI, Cardona sometimes carries a small, blue bag (also described as a "satchel" or "shaving kit"), which typically contains either money or drugs. (Tr. 22:5-16; 62:2-9). The CI said that Cardona routinely carries bags, and if he ever places a bag in the rear of his vehicle, it contains either narcotics or cash. (Tr. 36:8-12).

When cross-examined, Officer Cullen acknowledged that the CI had not observed Cardona perform any drug transactions or possess any firearms since at least September 2011. Indeed, all of the CI's information relating to Cardona's sale of narcotics or possession of firearms was based on her time spent with Cardona over one year prior to the CI's conversation with Officer Cullen.[2] Moreover, the CI did not provide any detail related to the illegal conduct he or she says occurred prior to September 2011. Despite telling Officer Cullen that Cardona

---

[2] (See Tr. 81:16-25):

| | |
|---|---|
| DEFENSE COUNSEL: | The facts that [the CI] relayed to you about Mr. Cardona, when did those facts and occurrences occur? Do you understand that? |
| OFFICER CULLEN: | Yeah. In that time frame, a year to a year and a half. |
| DEFENSE COUNSEL: | Year and a half before September, 2012? |
| OFFICER CULLEN: | To the best of my knowledge, yes. |
| DEFENSE COUNSEL: | Okay. So as of January of 2013, when Mr. Cardona was stopped, the activities that you were told about may have occurred a year before that even. |
| OFFICER CULLEN: | Approximately, yes. |

sold "large amounts" of heroin and cocaine, it appears that during her entire time spent with Cardona, he or she only observed him conduct, at most, one narcotics transaction. (See Tr. 56:24-25) (Officer Cullen testifying that the CI told him that "[a]t some point" prior to September 2011, he or she "had seen Mr. Cardona do a narcotics transaction").

During their meeting, the CI also told Officer Cullen that Cardona had previously been incarcerated for crimes related to narcotics and possession of firearms, and is currently on supervised release. (Tr. 37:3-4; Tr. 38:11-12). Officer Cullen later verified through Cardona's criminal record that Cardona had in fact been convicted of several drugs and firearms offenses, including a federal conviction in 2002. (See Gov. Ex. 1; Tr. 38:22-25). Officer Cullen also confirmed that Cardona currently remains on supervised release for his federal conviction. (Tr. 38:13-14).

After their initial face-to-face conversation, the CI and Officer Cullen never met in person again. (Tr. 33:14-16). Between September 2012 and January 2013, Officer Cullen and the CI had several, subsequent conversations on the telephone. (Tr. 33:7-21). The CI told Officer Cullen that he or she remained in periodic contact with Cardona from September 2012 through January 2013. Despite the CI's contact with Cardona during those months, he or she did not observe Cardona conduct any drug-transactions or otherwise engage in illegal activity during those months.[3] Indeed, the only memorable interaction the CI reported having with Cardona

---

[3] (See Tr.55:22-56:5):

DEFENSE COUNSEL: And during that time period [September 2012 to January 2013] that person never said that they observed Mr. Cardona do a drug transaction?

(continued...)

during those months occurred when he or she asked him why he had been so busy lately, to which Cardona responded: "[Y]ou know what I do. I'm busy." (Tr. 40:8-17).

In November 2013, the CI informed Officer Cullen that Cardona had moved from his apartment to a residence at 10838 Perrin Road. (Tr. 36:17-18). Soon thereafter, Officer Cullen confirmed the CI's information when he drove by the Perrin Road residence and saw the same Mercedes Benz and black Camaro parked in the driveway. (Tr. 36:21-22).

On January 2, 2013, Officer Cullen conducted surveillance outside the Perrin Road residence. (Tr. 41:17-18). When Officer Cullen arrived, he noticed a rental vehicle (Ford Edge rented from Avis) and the Mercedes Benz in the driveway. (Tr. 41:22-23). Around 10:00 a.m., Officer Cullen observed Cardona exit the residence with another male, later identified as Eric Coleman. (Tr. 42:1, 13-14). When Cardona exited the residence, he was carrying a small, blue bag. He and Coleman left the residence in the rental vehicle. (Tr. 42:2). Officer Cullen followed Cardona and Coleman for the next six hours. (Tr. 64:23-25). Officer Cullen admitted that during those six hours, he observed no suspicious activity, and had no reason to stop the vehicle. (Tr. 65:1-19).

---

[3](...continued)
OFFICER CULLEN:        [] Correct.

. . . .

DEFENSE COUNSEL:    And during that time period that person never told you that they saw Mr. Cardona possess weapons, did they?

OFFICER CULLEN:        You would be correct, no.

The next day, Officer Cullen returned to the Perrin Road residence. Once again, he observed Cardona exit the residence with Coleman while carrying a small, blue bag. Coleman and Cardona left the residence in the same rental vehicle. Cullen followed the vehicle for a short distance, but quickly became separated and terminated surveillance for that day. (Tr. 65:20-66:11).

On the morning of January 4, 2013, Officer Cullen was not available to observe the Perrin Road residence. Instead, he asked fellow Philadelphia Police Officer Stan Davis to conduct surveillance. (Tr. 43:4-11). At that time, Officer Davis had not conducted any surveillance upon the Perrin Road residence. He had "general information" regarding the investigation, but "didn't know the particulars." (Tr. 89:17; 96:3). Namely, Officer Davis knew the investigation involved a "Hispanic male . . . on federal parole" who lived at the Perrin Road Residence. (Tr. 96:5-9). He did not know the suspect's name or "any other information" about the investigation. (Tr. 90:2-3).

While conducting surveillance upon Perrin Road on January 4, 2013, Officer Davis observed Cardona and Coleman exit the residence together around 9:15 a.m. Cardona was once again carrying a small, blue bag. (Tr. 84:6-85:14). This time, however, Cardona also had two, filled trash bags, which he placed inside the trunk of his vehicle. (Tr. 44:2-4; 68:9-15). When Cardona and Coleman left the residence, Officer Davis—driving an unmarked vehicle with tinted windows—followed Cardona's rental vehicle. (Tr. 84:13-15; 86:2-5).

Shortly thereafter, Officer Davis contacted Officer Cullen to inform him that he was following Cardona's vehicle. (Tr. 86:25-87:1). When Cardona turned onto Academy Road, he

5

told Officer Cullen that Cardona was "driving erratically and checking his mirrors."[4] (Tr. 44:9). Officer Cullen instructed Officer Davis to have uniformed officers stop Cardona's vehicle and keep him there until he (Officer Cullen) arrived. While Officer Davis was making his request to have Cardona stopped by a marked vehicle, Cardona happened to pull into a bank parking lot (located in a shopping center) off of Academy Road.[5] (Tr. 87:18-21). After Cardona parked, two marked police vehicles—one of which was a "wagon" containing two uniformed officers—arrived on the scene. Officer Davis was also present. One of the uniformed officers took Cardona's license and registration and told Cardona and Coleman to remain in the vehicle until Officer Cullen arrived.

Officer Cullen arrived at the scene approximately fifteen to twenty minutes after Cardona's vehicle was initially stopped. (Tr. 87:20-88:3). When Officer Cullen arrived, Cardona and Coleman were still inside the rental vehicle. (Tr. 44:19-20). Officer Cullen approached the driver's side and asked Cardona to step out of the vehicle. (Tr. 44:20-23). After Cardona stepped out of the vehicle, Officer Cullen patted him down to confirm he had no weapons on his person. Despite discovering no weapons or contraband, Officer Cullen

---

[4] Officer Davis did not provide a basis for his conclusion that the defendant was "driving erratically." Although he alluded to the speed of Cardona's vehicle, he also testified that the defendant's driving conduct did not merit a ticket. (Tr. 90:25-91:1). He also said that he was concerned he might lose the vehicle if it proceeded to the highway. (Tr. 86:7-13; 92:11-16). We fully credit Officer Davis' testimony that he stopped the vehicle only because he was uncertain that he could maintain pace with Cardona's vehicle and, second, because of the way "he was looking out of the rearview mirror." (Tr. 92:11-16).

[5] The bank was the Police and Fire Credit Union, where it was later discovered Cardona had an account.

6

handcuffed Cardona and placed him in the rear of his police vehicle. (Tr. 44:22-23). Officer Cullen remained in the front seat of the vehicle.

Officer Cullen's partner, Sergeant Robert Friel, arrived on the scene approximately 3-5 minutes later. (Tr. 45:7-9). When Sergeant Friel arrived, he instructed Officer Cullen to remove the handcuffs from Cardona. (Tr. 45:9-11). Officer Cullen uncuffed Cardona but kept him detained in the rear of his vehicle, while Officer Cullen and Sergeant Friel both remained in the front seats. (Tr. 6:11-13; 7:25-8:2). While Cardona remained locked in the rear of the police vehicle, the officers showed Cardona their identifications, and initiated a "discussion" with Cardona. (Tr. 45:18-20).[6] Sergeant Friel—who was familiar with Officer Cullen's investigation— began telling Cardona "everything [he] knew about him." (Tr. 6:19). In particular, Sergeant Friel told Cardona that he knew Cardona was selling drugs again, he knew that Cardona had purchased expensive furniture under his sister's name, and he knew that Cardona had failed to inform his probation officer about his new residence. (Tr. 7:1-5). Evoking little response, Sergeant Friel then told Cardona that law enforcement officials had made undercover purchases of narcotics from Cardona, which Sergeant Friel admits was not true. (Tr.

---

[6]Sergeant Friel freely acknowledged that the purpose of their questioning was "to bluff him, to see if–where he would go, if he would wind up cooperating with us or if he would admit to it, . . . so I was basically talking to him to see if there was any way I could get him to admit that, what he was doing, and we could further our investigation." (Tr. 25:13-19). When he initiated this questioning, Sergeant Friel knew that he lacked evidence of Cardona's recent violation of any criminal or traffic laws. (Tr. 25: 20-21).

Officer Cullen stated that Cardona was stopped "in reference to an ongoing narcotics investigation." (Tr. 72: 6-7). Accordingly, we find as a fact that the sole purpose of the vehicle stop was to seek to advance the narcotics trafficking investigation.

7:8-9). At no point prior to, during, or after this "discussion" was Cardona provided with his Miranda warnings.[7]

Shortly thereafter, Cardona agreed to cooperate with the officers. (Tr. 7:18-20). Sergeant Friel told Cardona that he must first "come clean." (Tr. 7:21). Cardona told the officers that he had money inside his vehicle, but no guns or drugs. Sergeant Friel threatened to call for a canine unit, but Cardona maintained that only money was inside the vehicle. (Tr. 8:5-13). Sergeant Friel walked over to Cardona's vehicle and looked inside, where he could see the small, blue bag. When Sergeant Friel returned to Officer Cullen's vehicle, Cardona had agreed to sign a consent form to search his vehicle. (Tr. 9:2-6; see Gov. Ex. 2). After Cardona signed the form, Sergeant Friel searched the car and discovered $5,000 in the blue bag. No drugs or weapons were ever found in the vehicle. (Tr., at 9:22-10:2). Sergeant Friel could not recall searching the two trash bags in the trunk, which later turned out to contain Cardona's laundry. (Tr. 9:19-21; 68:9-25).

After Sergeant Friel searched the vehicle, Cardona agreed to sign a consent form to search his residence. (See Gov. Ex. 3). After he signed the consent form, he told Officer Cullen that there were two firearms in the master bedroom of his house, hidden inside laptop bags. (Tr. 49:11-12; 50:3-8). The Government concedes that prior to Cardona's confession about the firearms, no probable cause existed to arrest Cardona. (Tr. 172:15-21). There is also no dispute that approximately thirty to forty-five minutes passed between the time that Cardona was placed in the back of Officer Cullen's vehicle and when Cardona confessed about his firearms. (Tr.

---

[7] Because it is undisputed that Cardona was never provided his Miranda warnings, the Government has agreed it will not seek to admit any of Cardona's statements at trial. Accordingly, the statements are suppressed.

8

10:18; 30:22-31:4; see 47:23-48:4). From the moment he was approached by uniformed officers in the credit union parking lot, Cardona was not free to leave. (Tr. 20:24-25-32:1; 72:1-3; 95:16-20).

After Cardona signed the consent form, the officers went with Cardona to the Perrin Road residence. Officer Cullen transported Cardona in the back of his vehicle and Sergeant Friel drove Cardona's vehicle. (Tr. 50:17-18). During the five minute ride to the residence, Cardona told Officer Cullen that the officers may find a small amount of heroin somewhere in the residence. (Tr. 51:13-15). When the officers and Cardona arrived at the residence, Cardona used the combination lock to allow the officers inside. (Tr. 12:13-15; 51:19-22). Cardona remained in the kitchen with Officer Cullen while the other officers searched the residence. (Tr. 52:7-8).

Sergeant Friel located the two firearms in Cardona's upstairs bedroom, where Cardona said they were located. (Tr. 19-20). In addition to the firearms and accompanying ammunition, the officers also seized the following items from the Perrin Road residence: (1) $55,900.00 in United States currency (2) clear baggies knotted at top containing heroin (3) digital scale (4) packaging (5) talley sheets (6) surgical masks (7) money counter. The officers also discovered $526.00 on Cardona's person. (See Gov. Ex. 3, 4).

Defendant now brings this motion, seeking to suppress all evidence that the police discovered after stopping his vehicle. The Government has since responded, and this Court held a hearing on the suppression motion. The motion is now ripe for resolution.

II. CONCLUSIONS OF LAW

    A. Invalid Seizure

The Fourth Amendment protects "against unreasonable searches and seizures." "Generally for a seizure to be reasonable under the Fourth Amendment, it must be effectuated with a warrant based on probable cause." United States v. Robertson, 305 F.3d 164, 167 (3d Cir. 2002). Faced with a motion to suppress, the Government bears the burden of demonstrating the reasonableness of a warrantless search or seizure. United States v. Johnson, 63 F.3d 242, 245 (3d Cir. 1995).

1. Initial Vehicle Stop

In Terry v. Ohio, 392 U.S. 1 (1968), the Supreme Court established that absent a warrant, an officer may nonetheless "conduct a brief, investigatory stop when the officer has a reasonable, articulable suspicion that criminal activity is afoot." Illinois v. Wardlow, 528 U.S. 119, 123 (2000). A traffic stop is considered a "seizure" within the meaning of the Fourth Amendment. U.S. v. Deflfin-Colina, 464 F.3d 392, 396 (3d Cir. 2006). Traffic stops are akin to seizures under Terry v. Ohio, and thus, the initial stop is valid if the officer had "reasonable suspicion" to stop the vehicle. See United States v. Goodrich, 450 F.3d 552, 558-560 (3d Cir. 2006). Therefore, the relevant inquiry is whether Officer Cullen had reasonable suspicion that criminal activity was afoot at the time he instructed Officer Davis to stop Cardona's vehicle.[8]

---

[8] Of course, it is well-settled in the Third Circuit that this "reasonable suspicion" standard also includes whether the officer had a reasonable suspicion that a traffic violation occurred. United States v. Delfin-Colina, 464 F.3d 392, 397 (3d Cir. 2006); Whren v. United States, 517 U.S. 806, 810 (1996). Here, however, the Government does not contend Cardona was stopped for violating any traffic laws, as it is clear that no traffic violation was ever articulated to have occurred. (See Tr. 69:11-21). Accordingly, our inquiry focuses upon whether Officer Cullen had reasonable suspicion that criminal activity was afoot at the time he decided to stop Cardona's vehicle.

Although reasonable suspicion is a less demanding standard than probable cause, it still requires more than a mere "hunch." Terry, 392 U.S. at 27. The officers must have a "particularized and objective basis for suspecting the particular person stopped of criminal activity." United States v. Cortez, 449 U.S. 411, 417-18 (1981)). The officer must be able to provide "some objective manifestation that the person stopped is, or is about to be, engaged in criminal activity." Cortez, 449 U.S. at 418. "The ultimate question is whether a reasonable, trained officer standing in [Officer Cullen's] shoes could articulate specific reasons justifying [Cardona's] detention." Johnson v. Campbell, 332 F.3d 199, 206 (3d Cir. 2003). When determining whether an objective basis for reasonable suspicion existed at the time of the stop, we consider "the totality of the circumstances—the whole picture." Cortez, 449 U.S. at 417.

It is well-established that support for an officer's reasonable suspicion may, as purported here, stem from "information furnished by a tipster or informant, provided that such information carries sufficient 'indicia of reliability.'" United States v. Abney, 496 Fed. Appx. 248, 251 (3d Cir. 2012) (quoting Adams v. Williams, 407 U.S. 143, 147 (1972)). To help determine whether the informant's information is reliable, the Third Circuit has identified five factors for courts to consider, which include: (1) face-to-face interaction, (2) whether person can be held responsible if allegations turn out to be fabricated, (3) whether information is available to any observer, (4) whether the person providing the information recently witnessed the alleged criminal activity, and (5) predictability of the tip. U.S. v. Brown, 448 F.3d 239, 249-50 (3d Cir. 2006) (citations omitted).

The Government emphasizes that the factors—namely "face-to-face" contact and corroboration of certain facts—suggest that the CI's information given to Cullen was true and

11

accurate. We agree that nothing in the record suggests the CI's information was fabricated. Reasonable suspicion, however, requires not only that there is some reason to believe the information is true; it also requires that the information itself is reliable. Here, the notable amount of time that had passed since the informant allegedly witnessed Cardona engage in criminal activity, in addition to the lack of detail accompanying the description of those activities, severely undermines the present value of the information.

The CI told Officer Cullen that Cardona engaged in the following illegal activity: (1) Cardona sometimes carries drugs in a small, blue bag, (2) Cardona possesses firearms, (3) when Cardona places bags in the rear of his vehicle, those bags sometimes contain drugs, and (4) Cardona utilizes rental cars to conduct drug transactions. The CI also told Cullen that "[a]t some point" during the CI's time spent with Cardona, he or she "had seen Mr. Cardona do a narcotics transaction." Tr. 56:24-25. All of these vaguely described activities, however, occurred (at least) 12 months prior to the CI's contact with Officer Cullen, and (at least) 15 months prior to the traffic stop. When Officer Cullen ordered the traffic stop, he was not aware of a single, illegal act performed by Cardona since at least September 2011. The CI's stale and vague information, whether truthfully provided or not, is simply insufficient on its own to support reasonable suspicion. That the defendant sold drugs some time prior to September 2011 does not create a reasonable basis to conclude that the defendant was transporting drugs on January 4, 2013.

Because the CI's information was conclusory and outdated, a reasonable officer recognizes that such stale information is not reliable unless refreshed and corroborated. See U.S. v. Nelson, 284 F.3d 472, 480 (3d Cir. 2002) ("If . . . a tip on its own carries few indicia of reliability, much corroborating information is necessary to demonstrate reasonable suspicion.").

12

Indeed, Officer Cullen recognizes the importance of corroborating otherwise unreliable information provided by a confidential informant.[9]

The Government emphasizes that a significant amount of the information provided by the CI was in fact corroborated by Officer Cullen. However, all of that information—location of residence; identity of vehicles; criminal record—provides no suggestion of illegal behavior. The Supreme Court has made clear that reasonable suspicion "requires that a tip be reliable in its *assertion of illegality*, not just in its tendency to identify a determinate person." Florida v. J.L., 529 U.S. 266, 272 (2000) (emphasis added). Thus, the relevant inquiry here is whether Officer Cullen's observations corroborated the assertions of illegality—not merely information—provided by the CI. See id. at 480.

---

[9] (See Tr. 58:1-14).

| | |
|---|---|
| DEFENSE COUNSEL: | And you've been involved in dealing with confidential informants before, have you not? |
| OFFICER CULLEN: | Yes. |
| DEFENSE COUNSEL: | And during that period of time, am I correct that one of the things that you normally do is you attempt to get information to corroborate what your confidential informant tells you, correct? |
| OFFICER CULLEN: | Yes. |
| DEFENSE COUNSEL: | Okay. And this is so you don't have to solely rely on that confidential informant, correct? |
| OFFICER CULLEN: | Correct. |

Our corroboration inquiry begins on January 2, 2013, when Officer Cullen conducted surveillance upon Cardona's residence. On that day, Officer Cullen observed Cardona leave the Perrin Road residence with a small, blue bag, similar to that described by the CI. He also saw Cardona enter a rental vehicle with Coleman. Thus, according to the CI, Cardona should have been on his way to conduct a drug transaction. After following Cardona for six hours, however, Officer Cullen did not observe Cardona engage in any illegal activity or any activity that was otherwise suspicious. Rather, Officer Cullen reported that during those six hours, Cardona stopped for breakfast, went to a cell phone store, and visited a junk yard. (Tr. 65:1-15).

Similarly, on January 3 and 4, 2013, Cardona was again seen entering his rental vehicle with Coleman, while carrying the small, blue bag. Once again, no illegal (or potentially illegal) activity was reported to have occurred. Despite possessing his small, blue bag while driving a rental vehicle, Officer Cullen never observed Cardona engage in anything related to a drug transaction. Thus, not only did Officer Cullen's surveillance fail to corroborate the CI's assertion of illegality; his observations actually undermined the veracity of that information. See id. ("[W]here the tip contains information that later investigation contradicts, . . . there is no reasonable suspicion."). If anything, the surveillance merely corroborated that Cardona does in fact own a small, blue bag and does in fact drive rental vehicles.

Nonetheless, the Government argues that even if Officer Cullen never observed Cardona engage in a drug transaction, reasonable suspicion need not be based on illegal conduct. The Government contends that Cardona's legal conduct—namely, driving rental vehicles despite owning other expensive vehicles, carrying a small bag, and placing trash bags into his trunk—in

14

combination with Cardona's criminal record, and "erratic" driving, provided reasonable suspicion to stop Cardona's vehicle. (See Doc. No. 17, at 12). We disagree.

The Government is correct that reasonable suspicion does not require the individual's conduct be illegal. However, the "legal" conduct still must point to some presence of illegal (or potentially illegal) activity. The Supreme Court has identified factors that suggest suspicious behavior, even if the person is engaging in otherwise "legal" activity. These factors include: (1) "[p]resence of a suspect in a high crime area," (2) "[a] suspect's presence on a street at a late hour," (3) "[a] suspect's 'nervous, evasive behavior,' or flight from police," (4) "[a] suspect behaves in a way that conforms to police officers' specialized knowledge of criminal activity." Brown, 448 F.3d at 251 (citations omitted).

Here, there is no allegation that Cardona was seen in a high crime area and we know that the traffic stop occurred in the morning. For the reasons described supra, Officer Cullen had no reason to believe that the presence of Cardona's blue bag or rental car pointed toward criminal activity, as there is nothing inherently suspicious about carrying a small, blue bag or driving a rental vehicle (regardless of whether he owned other vehicles).[10] The Government acknowledges that Cardona did not flee from Officer Davis's vehicle, but argues that Cardona's "erratic" driving suggests "nervous, evasive behavior." At the hearing, Officer Davis explained that he

---

[10] As we explained at the hearing, Officer Cullen believed (based on the CI and his investigation) that Cardona was either a cocaine or heroin dealer, and both of those drugs are very compact, weighty items. It is not logical to infer that the two trash bags were filled with multiple bricks of cocaine or heroin, as trash bags would not be strong enough to support the weight. It is true that marijuana is a type of drug that could easily be transported in a trash bag and transported in bulk. Here, however, we have no indication that Officer Cullen believed Cardona sold marijuana. We cannot say that the mere presence of trash bags leads a reasonable officer in the shoes of Officer Cullen to fairly deduce that those bags are filled with contraband.

15

described Cardona's driving as "erratic" because of the speed of the vehicle. However, when asked to provide specifics, he could not articulate an approximate speed of Cardona's vehicle, and admitted that it was not fast enough to warrant a traffic citation. (See Tr. 90:23-91:8).

Officer Davis also testified that he saw Cardona "checking his mirrors," which apparently suggests that Cardona suspected he was being followed, and thus may try to flee. Officer Davis feared that if Cardona got on the highway, he would not be able to keep up with him. The Government argues that this fear of flight provided at least some reasonable suspicion to stop Cardona's vehicle. We first note that any reasonable driver is expected to check his mirrors when operating his or her vehicle. Indeed, most cautious drivers—whether engaging in criminal conduct or not—will check their mirrors if they suspect they are being followed by an unfamiliar vehicle. Moreover, we find the Government's argument circular. A person who suspects he is being followed will generally only flee if he is engaging in illegal activity; whether Cardona was engaging in illegal activity is the precise inquiry we are trying to resolve here. Therefore, the Government's argument is rejected.

In sum, the only relevant information (i.e., assertions of illegality) provided by the CI was notably vague and outdated. In light of the unreliability of the information provided by the CI, "some unquantifiable but significant amount of corroborating information [was] required to establish reasonable suspicion" to stop Cardona's vehicle, and the record is devoid of that evidence. See Brown, 448 F.3d at 252. For that reason, we conclude that the initial stop of Cardona's vehicle was unreasonable within the meaning of the Fourth Amendment.

        2.        Subsequent Detention

Even if we were to assume Officer Cullen had reasonable suspicion to initially stop Cardona's vehicle (he did not), we conclude that the seizure was nonetheless invalid because the Terry stop turned into a de facto arrest, for which no probable cause existed.

While a law enforcement official may conduct a brief investigatory stop if they have "reasonable, articulable suspicion that criminal activity is afoot," the officer must have probable cause to justify longer and more intrusive detentions. U.S. v. Sharpe, 470 U.S. 675, 685 (1985). The Government bears the burden to prove the Terry stop "was sufficiently limited in scope and duration to satisfy the conditions of an investigative seizure." Florida v. Royer, 460 U.S. 491, 500 (1983).

"The line between a proper Terry stop and an improper de facto arrest is elusive and not easily drawn." Leal, 235 Fed. Appx. at 940 (citing Sharpe, 470 U.S. at 685). The Supreme Court has refused to impose a rigid, "bright-line" time limitation on Terry stops. Sharpe, 470 U.S. at 685 ("Much as a "bright line" rule would be desirable, in evaluating whether an investigative detention is unreasonable, common sense and ordinary human experience must govern over rigid criteria."). To determine whether a stop is "so minimally intrusive as to be justifiable on reasonable suspicion" courts must consider a number of factors including: "(1) the duration of the stop; (2) the purposes justifying the investigatory detention; (3) whether the police acted diligently to confirm or dispel their suspicions; and (4) any reasonable alternatives the police could have employed to serve their purposes." Fraguela-Casanova, 858 F. Supp. at 442 (citing Sharpe, 470 U.S. at 684–87; Leal, 235 Fed.Appx. at 941).

Here, several uniformed police officers detained Cardona for nearly an hour before probable cause for an arrest was developed (i.e., the confession to possession of weapons).

17

During that time he was handcuffed and un-cuffed. When Officer Cullen arrived on the scene, he frisked Cardona, confirming that Cardona was not carrying any weapons or contraband. Nonetheless, Cardona spent a majority of the investigatory stop detained in the backseat of Officer Cullen's police vehicle. During that time, Officer Cullen and Sergeant Friel interrogated Cardona for nearly thirty minutes, with questions unrelated to dispelling or confirming the "suspicion" for conducting the stop, the alleged "erratic driving behavior." To the contrary, the officers freely admitted they questioned the defendant in an effort to further their narcotics trafficking investigation. (Tr. 25: 13-21; 72: 6-7). While the Government and officers repeatedly attempt to justify the lengthy stop and inquiry as part of an "ongoing narcotics investigation," a Terry stop "does not permit police officers to detain suspects indefinitely to complete an investigation." U.S. v. Fraguela-Casanova, 858 F. Supp. 2d 432, 441 (M.D. Pa. 2012) (citing Dunaway v. New York, 442 U.S. 200, 212 (1979); United States v. Leal, 235 Fed. Appx. 937, 940 (3d Cir.2007)). Rather, courts must ensure that police officer's investigative methods "verify or dispel the officer's suspicion in a short period of time." Royer, 460 U.S. at 500.

      This prolonged discussion was completely unrelated to the purported reasons for stopping Cardona, and extended for far longer than necessary "to allow the officers to perform a careful check to satisfy themselves that there was no danger from accessible weapons and to confirm or dispel their suspicions." U.S. v. Holyfield, 282 Fed. Appx. 129, 131 (3d Cir. 2008). Therefore, we cannot conclude that was a brief, investigatory stop based upon objectively identified reasonable factors. Rather, we conclude that the nearly thirty minute detention in the back of Officer Cullen's police vehicle was a de facto arrest. Because the officers admittedly had no probable cause to hold Cardona under arrest prior to his statement of admission regarding the

18

firearms in his residence, his seizure was not reasonable within the meaning of the Fourth Amendment.

      B.      Suppression

Having concluded that Cardona was unlawfully seized, we next must determine whether this Fourth Amendment violation taints the fruits of the search of Cardona's vehicle and the Perrin Road residence, to which Cardona consented. The Third Circuit has made absolutely clear that "[c]onsent following an illegal seizure does not in itself purge the taint of the illegality for Fourth Amendment purposes; the government must show sufficient attenuation to causally disconnect the consent from the seizure." United States v. Mosley, 454 F.3d 249, 261 (3d Cir. 2006). Several factors inform our attenuation analysis, including (1) whether Miranda warnings were given, (2) the temporal proximity of the constitutional violation and the subsequent consent, (3) the presence or absence of intervening circumstances, and (4) particularly, the purpose and flagrancy of the official misconduct. Brown, 422 U.S. at 603-04; United States v. Luna, 76 Fed. App'x 411, 414 (3d Cir. 2003) (applying Brown factors in tainted consent analysis). Of course, since the attenuation inquiry involves balancing the benefits and costs of exclusion, "[n]o single fact is dispositive." Brown, 422 U.S. at 603. To avoid suppression, the Government bears the burden of proving attenuation by a preponderance of the evidence. Brown, 422 U.S. at 604; Kaupp v. Texas, 538 U.S. 626, 632-33 (2003); United States v. Pelullo, 173 F.3d 131, 137-38 (3d Cir. 1999).

Here, the Government has failed to prove that any attenuation occurred. First, no Miranda warnings were ever provided to Cardona. Second, even if we start the clock at the initial vehicle stop, no more than an hour passed in between the constitutional violation and

subsequent consent. Third, essentially no intervening circumstances of import occurred, other than the officers' extensive and partially untruthful interrogation, which also contributes to the fourth factor. Because the Government has failed to show that sufficient attenuation causally disconnected the consent from the seizure, the evidence obtained in Cardona's vehicle and residence is suppressed.[11] See Brown, 448 F.3d at 244 (evidence obtained pursuant to an unlawful Terry stop "must be suppressed").

III.    CONCLUSION

For the foregoing reasons, Defendant's Motion to Suppress is GRANTED.

BY THE COURT:

/s/ Legrome D. Davis

Legrome D. Davis, J.

---

[11] Because the unlawful seizure taints the subsequent consent, it is immaterial whether the consent was voluntary or involuntary, and we thus need not engage in that analysis.